UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:19-cv-06301-AB-KS | Date: | August 28, 2020 |

| | |
|---|---|
| Title: | *Philips North America LLC v. Garmin Int'l, Inc. et al.* |

| | |
|---|---|
| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**     **[IN CHAMBERS] CLAIM CONSTRUCTION ORDER (DKTS. 75, 77, 79, 80)**

Plaintiff Philips North America LLC ("Plaintiff") and Defendants Garmin International, Inc. and Garmin Ltd. (collectively, "Defendants") have filed claim construction briefs asking the Court to construe 28 disputed claim terms found in six asserted patents: (1) U.S. Patent No. 6,013,007 ("the '007 Patent"); (2) U.S. Patent No. 7,088,233 ("the '233 Patent"); (3) U.S. Patent No. 6,976,958 ("the '958 Patent"); (4) U.S. Patent No. 8,277,377 ("the '377 Patent"); (5) U.S. Patent No. 9,314,192 ("the '192 Patent"); and (6) U.S. Patent No. 9,801,542 ("the '542 Patent") (collectively, "the Asserted Patents").

The parties filed a Joint Claim Construction and Prehearing Statement on June 23, 2020. ("Joint Statement," Dkt. No. 73). The parties filed their Opening Claim Construction Briefs on June 26, 2020. ("Plaintiff's Opening Brief," Dkt. No. 77; "Defendants' Opening Brief," Dkt. No. 75.) The parties filed Responsive Claim Construction Briefs on July 9, 2020. ("Plaintiff's Responsive Brief," Dkt. No. 80; "Defendants' Responsive Brief," Dkt. No. 79.) Finding this motion suitable for resolution without oral argument, the Court vacated the hearing set for July 31, 2020. (*See* Dkt. No. 86; Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.)

The disputed terms are construed as set forth in this Order.

## I.  TECHNOLOGICAL SUMMARY

The Asserted Patents generally relate to monitoring a subject's activity or health condition.

The '007 Patent, titled "Athlete's GPS-Based Performance Monitor," issued on January 11, 2000 and generally describes a "Global Positioning System (GPS) based personal athletic performance monitor." '007 Patent at Abstract.

The '233 Patent, titled "Personal Medical Device Communication System and Method," issued on August 8, 2006 and generally describes "[a] personal and/or institutional health and wellness communications system, which may be used for a variety of emergency and non-emergency situations using two-way communications devices and a bi-directional communication network." '233 Patent at Abstract.

The '958 Patent, titled "Method and Apparatus for Health and Disease Management Combining Patient Data Monitoring with Wireless Internet Connectivity," issued on December 20, 2005 and generally describes "a method and apparatus for a wireless health monitoring system for interactively monitoring a disease or health condition of a patient by connecting an internet-enabled wireless web device ('WWD') to a digital camera or other health monitoring device." '958 Patent at Abstract.

The '377 Patent, titled "Method and Apparatus for Monitoring Exercise with Wireless Internet Connectivity," issued on October 2, 2012 and generally describes a method and apparatus for providing "wireless monitoring of exercise, fitness, or nutrition by connecting a web-enabled wireless phone to a device which provides exercise-related information, including physiological data and data indicating an amount of exercise performed." '377 Patent at Abstract.

The '192 Patent, titled "Detection and Compensation Method for Monitoring the Place of Activity on the Body," issued on April 19, 2016 and generally describes "[a] measuring system compris[ing] a sensor arranged to be attached to a subject for obtaining a measured value representing a physical or a physiological quantity of the subject." '192 Patent at Abstract.

The '542 Patent, titled "Health Monitoring Appliance," issued on October 31, 2017 and generally describes a "heart monitoring system for a person [that] includes one or more wireless nodes; and wearable appliance in communication with the one or more wireless nodes, the appliance monitoring vital signs." '542 Patent at Abstract.

Relevant disclosures from each of the Asserted Patents will be discussed in greater detail in relation to each of the parties' specific claim construction disputes.

## II.   LEGAL STANDARD

### A. General Claim Construction Principles

As established in *Markman v. Westview Instruments*, 517 U.S. 370 (1996), claim construction is a matter wholly within the jurisdiction of the court. *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent . . . is exclusively within the province of the court."). The purpose of claim construction is to "determin[e] the meaning and scope" of a patented invention in order to define the patent owner's rights. *Id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction is a legal issue that may require subsidiary findings of fact. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015).

Generally, a claim term is given its "ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In patent cases, "the ordinary and customary meaning . . . is the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention." *Philips*, 415 F.3d at 1313. "In some cases, the ordinary meaning . . . may be readily apparent," requiring only common sense application of a widely accepted meaning. *Id.* at 1314. However, when claim meaning is not so readily apparent, a court must determine what a skilled person in the appropriate field of art would understand a claim term to mean. *Id.*

Courts first consider the intrinsic evidence, which includes the patent claims, patent specification, and prosecution history. *Vitronics*, 90 F.3d at 1582. "Attending this principle, a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point out and distinctly claim the [patented] subject matter.'" *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)). A term's use in context may help to distinguish or clarify its meaning from other potential definitions. *See, e.g.*, *Phillips*, 415 F.3d at 1314 (illustrating that "steel baffles" implies that "baffles" are not intrinsically made of steel). Claim terms are commonly used consistently throughout a patent, and thus "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

The claim terms must be read in light of the specification. *Id.* at 1315 (citing *Vitronics*, 90 F.3d at 1582 ("[T]he specification 'is always highly relevant . . . . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'")). The specification may provide insight into an inventor's understanding of her invention at the time of patenting, as it might contain an intentional disclaimer of claim scope that reveals

limits on an inventor's intended invention. *Phillips*, 415 F.3d at 1316. The Federal Circuit has also recognized that an inventor may invoke a particular definition of a term in her specification or otherwise use a term in the specification in a manner that differs from the term's ordinary usage. *Id.* "In such cases, the inventor's lexicography governs." *Id.*

In addition to the patent itself, the Court "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317. The prosecution history consists of "all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582. However, because the prosecution history, also called the "file history" or "file wrapper," is a product of negotiations between the inventor and the United States Patent and Trademark Office ("USPTO"), "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Nevertheless, like the specification, the prosecution history may still be useful in understanding the inventor's understanding of her own invention. *Id.* (citing *Vitronics*, 90 F.3d at 1582-83). Moreover, during prosecution history, a patent applicant may disclaim claim scope by making a clear and unequivocal disavowal of the plain meaning of ordinary claim language. *Id.* at 1319 (citing *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

After looking at the intrinsic evidence, courts may consider extrinsic evidence, including inventor and expert testimony, dictionaries, and treatises. *Phillips*, 415 F.3d at 1317. However, extrinsic evidence is "less significant than the intrinsic record" because it is generally "less reliable." *Id.* at 1317-18. Additionally, extrinsic evidence cannot be used to change the meaning of a term as used in the specification. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Thus, the extrinsic evidence should always be considered in context of the intrinsic evidence. *Phillips*, 415 F.3d at 1319.

Technical dictionaries are a particular type of extrinsic evidence that may provide information about the ways a term is used in a particular field of art. *Id.* at 1318. Expert testimony may also be useful in several ways, "such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding . . . is consistent with that of a person of skill in the art, or to establish that a particular term . . . has a particular meaning in the pertinent field." *Id.* However, as with all extrinsic evidence, courts will "discount any expert testimony 'that is clearly at odds with [the intrinsic evidence] of the patent,'" as well as expert testimony that is conclusory or unsupported. *Id.* (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

## B. Claim Term Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see also* 35 U.S.C. § 112 ¶ 2. This standard "mandates clarity, while recognizing that absolute precession is unattainable." *Id.* at 910. "General principles of claim construction apply to indefiniteness allegations." *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019) (*citing Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015)). To the extent subsidiary facts are presented to support that a claim term is indefinite, they must be proven by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).

## C. Means-Plus-Function Claim Construction Principles

Under Section 112, Paragraph 6[1] of the Patent Act,

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6. "[U]se of the word 'means' creates a presumption that § 112, ¶ 6 applies." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (quoting *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998)); *but see Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (claim term "wireless device means" does not invoke § 112, ¶ 6 because it denotes a class of structures).

Conversely, when a claim term lacks the word "means," there is a presumption against "means-plus-function" claiming. *Id.* "[T]he presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed.

---

[1] The America Invents Act ("AIA") amended the labeling convention of sub-sections of § 112 of the Patent Act, so that the sub-sections correspond to letters instead of numbers. Thus, 35 U.S.C. § 112 ¶ 6 was relabeled to 35 U.S.C. § 112(f). Because the Asserted Patents in this case were filed before the AIA took effect, the Court refers to the prior labeling convention in this Order.

Cir. 2000)). This often occurs with certain "well-known nonce word[s]" like "module," "mechanism," "element," and "device" that "operate as a substitute for 'means,' in the context of § 112, para. 6." *Id.* at 1350. "In assessing whether the claim limitation is in means-plus-function format, [courts] do not merely consider the introductory phrase (e.g., 'mechanical control assembly') in isolation, but look to the entire passage including functions performed by the introductory phrase." *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1342 (Fed. Cir. 2019). The critical question is whether "the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6." *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015).

After concluding that a term is governed by 35 U.S.C. § 112 ¶ 6, courts engage in a two-step process to construe the term. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012). First, the court identifies the claimed function. *Id.* Second, "the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351 (citations omitted). When a claimed function requires the special programing of a general-purpose computer or processor, the specification must "disclose an algorithm for performing the claimed function" "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Noah*, 675 F.3d at 1312. Further, "[w]here there are multiple claimed functions . . . the patentee must disclose adequate corresponding structure to perform all of the claimed functions." *Williamson*, 792 F.3d at 1351-52. "If the patentee fails to disclose adequate corresponding structure, the claim is indefinite." *Id.*

## III.   ANALYSIS

### A. Agreed Constructions

| Term | Agreed Construction |
|------|---------------------|
| "the application" ('377 Patent, Claim 1) | The parties agree that where the claim recites "the application" it is referring to the same application |

(*See* Dkt. No. 73-1 at 1.)

The Court accepts the parties' agreed construction, which will bind them. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377-78 (Fed. Cir. 2007) (rejecting appellate challenge to claim construction agreed to by party in district court).

### B. Disputed Terms

1. "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" ('007 Patent, Claims 1, 21)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a processor (and equivalents thereof) that determines any of the following from a series of time-stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete" <br><br> 35 U.S.C. § 112, ¶ 6 <br><br> **Structure:** <br> a processor and equivalents thereof <br><br> **Function:** <br> computing athletic performance feedback data [as construed above as elapsed distance of an athlete; current or average speed of an athlete; and/or current or average pace of an athlete] from the series of time-stamped waypoints obtained by said GPS receiver | Indefinite <br><br> 35 U.S.C. § 112, ¶ 6 <br><br> **Structure or algorithm:** <br> Not disclosed <br><br> **Function:** <br> computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver |

The parties agree that the term "means for computing athletic performance feedback data from the series of time-stamped waypoints" is subject to 35 U.S.C. § 112 ¶ 6 as a means-plus-function term. The parties dispute (1) the proper interpretation of the claimed function and (2) whether a corresponding structure has been adequately disclosed for the term.

First, the parties specifically dispute the meaning of the phrase "athletic performance feedback data" as it appears in this claim limitation. Plaintiff argues that in the context of the full claim limitation, which requires computation "from the series of time-stamped waypoints," the phrase "athletic performance feedback data" only refers to

"elapsed distance of an athlete; current or average speed of an athlete; [or] current or average pace of an athlete." (*See* Dkt. No. 77 at 5.) Plaintiff asserts that the '007 Patent describes certain types of athletic performance feedback data that are not computed from time-stamped GPS waypoints but instead through other means, such as through a barometric pressure sensor. (*Id.*) Plaintiff further asserts that the '007 Patent "describes the types of data that **can be** calculated from GPS position and time information." (*Id.* (emphasis in original).)

In its Opening Brief, Plaintiff cites a portion of the specification to support its assertion about data types that "can be" calculated from time-stamped waypoints. (*Id.*) In particular, the specification refers to "elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining." '007 Patent at 7:40-50. In their briefs, Defendants emphasize "calories burned" from this list. Defendants question Plaintiff's omission of "calories burned" from Plaintiff's proposed construction and use "calories burned" as one example of a circumstance where Plaintiff has not shown a corresponding algorithm for how calories burned could be computed "from the series of time-stamped waypoints." In its Responsive Brief, Plaintiff appears to walk back from its previously-quoted portion of the specification. It asserts that the specification refers to calories burned in the context of "athletic performance data," but not in the context of "athletic performance <u>feedback</u> data." (Dkt. No. 80 at 2 (emphasis in original).) It otherwise asserts that the specification's references to "calories burned" are "ambiguous" and states, without support, that a person of skill in the art would not have understood "athletic performance feedback data" to include calories burned. (*Id.*)

Plaintiff's arguments for limiting the scope of what constitutes "athletic performance feedback data" are not persuasive. As both parties noted, the specification states:

> During the exercise session, the GPS receiver module 604 continuously determines the athlete's geographical position and stores it in the memory 608 along with other information such as the date and time that each position was acquired. ***From these positions and times,** performance data **such as elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining are calculated.*** Based on this data, recommendations to increase or decrease level of effort to meet pre-set performance targets are then determined.

'007 Patent at 7:41-50 (emphasis added). Although Plaintiff discounts this language in its Responsive Brief, this passage supports Defendants' position regarding the meaning of the term "athletic performance feedback data." It specifically states that "performance data" like "calories burned" can be calculated based on positions and times collected by a GPS receiver during a session. Plaintiff does not otherwise show that the patent applicant

intended to limit the meaning of the claim phrase in the manner it urges in its proposed construction, and the Court finds Plaintiff's interpretation of the intrinsic record in this regard unpersuasive. Calories burned is reasonably interpreted as a type of "athletic performance <u>feedback</u> data," given this disclosure, and Plaintiff does not identify passages showing that the patent applicant intended to exclude "calories burned" from a construction of the term.

Second, Defendants dispute whether the patent specification adequately discloses corresponding structure for this claim limitation. Plaintiff asserts that the claim language itself supplies the algorithm because the claims "require that athletic performance feedback data be calculated from a series of time-stamped waypoints obtained from a GPS receiver." (*See* Dkt. No. 80 at 2.) Plaintiff suggests that this computation would require only "high school level math" and "involves determining the distance between two points" or "dividing the distance by time or time by distances." (Dkt. No. 77 at 9.) Defendants note that Plaintiff's arguments are based on limiting the types of data that constitute "athletic performance feedback data." Defendants also assert that at the time of the invention, computing athletic performance feedback data would not be as simple as Plaintiff's expert suggests because the computation would need to account for errors in the received GPS data. (*See* Dkt. No. 79 at 5-6.)

As Plaintiff effectively concedes, the specification at most refers to a GPS module, memory, and CPU as corresponding structure for this means-plus-function term. (Dkt. No. 77 at 8.) Further, Plaintiff's expert does not dispute that a CPU would require special programming in order to satisfy the claimed function of "computing athletic performance feedback data from [a] series of time-stamped waypoints." (Dkt. No. 79 at 1 (citing Dkt. 79-4 (Deposition of Thomas Martin (June 18, 2020) in *Philips North America LLC v. Fitbit, Inc.*, Case No. 1:19-cv-11586-IT (D. Mass.)) at 48:6-50:14).) In these circumstances, legal authority requires the asserted patent to disclose an algorithm representing the corresponding structure for this specially-programmed function:

> [T]he algorithm requirement is necessary '[b]ecause general purpose computers can be programmed to perform very different tasks in very different ways . . . ." [*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).] Without disclosing any corresponding structure, "one of skill simply cannot perceive the bounds of the invention." [*Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1341 (Fed. Cir. 2008).]

*Noah*, 675 F.3d at 1318.

Particularly when the phrase "athletic performance feedback data" is not limited to Plaintiff's proposed data types, there is insufficient disclosure supporting how to compute various types of "athletic performance feedback data." As Defendants note as just one

example, the '007 Patent fails to disclose an algorithm for computing "calories burned" from the series of time-stamped waypoints. The "calories burned" example does not appear to fit with Plaintiff's examples where Plaintiff asserts the use of "high school math" provides sufficient structure. Even where Plaintiff and its expert do attempt to propose an algorithm for certain limited types of athletic performance feedback data, the Court agrees with Defendants that Plaintiff's expert's assertions are based on assumptions that are not sufficiently reflected in the disclosure of the '007 Patent (including the claim language itself), and thus are insufficient to constitute corresponding structure. The claim solely refers to "computing" data; this is insufficient information to glean an appropriate manner of performing such a computation. *See Noah*, 675 F.3d at 1318.

Because the '007 Patent does not disclose any algorithms for "computing athletic performance feedback data from the series of time-stamped waypoints," there is no corresponding structure disclosed for this claim term. The Court accordingly finds that the term "means for computing athletic performance feedback data from the series of time-stamped waypoints" is indefinite for lack of corresponding structure under 35 U.S.C. § 112.

### 2. Other Terms in the '007 Patent

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "means for presenting the athletic performance feedback data to an athlete ('007 Patent, Claims 1, 21) | No construction necessary.<br><br>Alternatively, "a display and/or audio headphones (and equivalents thereof) that presents the athletic performance feedback data to an athlete"<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Structure:**<br>a display and/or audio headphones and equivalents thereof | 35 U.S.C. § 112, ¶ 6<br><br>**Structure:**<br>Wired headset (including all technical components for audio connections, amplification, speech synthesizer etc.). Feedback data is optionally also scrolled across the display while it is also being announced via the audio headphones. |

| | | |
|---|---|---|
| "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" ('007 Patent, Claim 7) | "a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold"<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Structure:**<br>a processor and equivalents thereof<br><br>**Function:**<br>suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold (as construed above) | Indefinite<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Structure:**<br>Not disclosed<br><br>**Function:**<br>suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold |
| "means for exchanging GPS route waypoints via said Internet web site" ('007 Patent, Claim 25) | No construction necessary<br><br>Alternatively, "an Internet web site (and equivalents thereof) that exchanges GPS route waypoints"<br><br>35 U.S.C. § 112, ¶ 6.<br><br>**Structure:**<br>an Internet web site and equivalents thereof (See, e.g., original claim, col. 9 ll. 52-62)<br><br>**Function:**<br>exchanging GPS route waypoints | Indefinite<br><br>35 U.S.C. § 112, ¶ 6.<br><br>**Structure:**<br>Not disclosed<br><br>**Function:**<br>exchanging GPS route waypoints via said Internet web site |

The parties also dispute the proper construction of the phrases (1) "means for presenting the athletic performance feedback data to an athlete," which appears in Claims 1 and 21 of the '007 Patent; (2) "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold," which appears in dependent Claim 7 of the '007 Patent; and (3) "means for exchanging GPS route waypoints via said Internet web site," which appears in dependent Claim 25 of the '007 Patent. In the preceding section of this Order, the Court finds the phrase "means for computing athletic performance feedback data from the series of time-stamped waypoints," which appears in Claims 1 and 21 of the '007 Patent, indefinite. Because the Court has already found a claim phrase in Claims 1 and 21 of the '007 Patent indefinite, the parties' disputes regarding other claim terms that appear in Claims 1 and 21 or in dependent claims that depend from either Claim 1 or 21 are moot. The Court declines to issue advisory opinions regarding the meaning of those claim phrases, and they are not construed at this time.

    3.   "governing information transmitted between the first personal device and the second device" ('233 Patent, Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "controlling the transmission of information between the first personal device and the second device" | **Original Construction:** Plain and ordinary meaning<br><br>**Revised Construction:** "a security mechanism continuously controlling multiple levels of access to information transmitted between the first personal [medical] device and the second device" |

The term "governing information transmitted between the first personal device and the second device" appears in Claim 1 of the '233 Patent. Claim 1 recites:

A bi-directional wireless communication system comprising:
    (a) a first personal device, the first personal device further comprising:
        (i) a processor,
        (ii) a memory;
        (iii) a power Supply;
        (iv) at least one detector input; and
        (v) a short-range bi-directional wireless communications module;
    (b) a second device communicating with the first device, the second device having a short-range bi-directional wireless communications module compatible with the short-range bi-directional wireless communications module of the first device; and

> (c) a security mechanism ***governing information transmitted between the first personal device and the second device***.

'233 Patent at Claim 1 (emphasis added).

Both parties refer to Figure 5 of the '233 Patent as a relevant example in understanding this claim term. Figure 5 shows a personal medical device 100 belonging to "Victim V." It further shows connections between personal medical device 100 and a "Bystander B," "Responding Personnel R," and "Dispatcher or Medial Caregiver D." The specification explains how each of these other parties can use devices of their own to communicate with and/or collect relevant information from personal medical device 100, in the event of an emergency. Both parties appear to agree at a high level that the purpose of Claim 1's requirement for "a security mechanism governing information transmitted between the first personal device and the second device" is to ensure that only appropriate information is available to the appropriate second party.

The parties differ, however, in their additional characterization of the claim language. Defendants refer to the security mechanism's function as requiring "continuous" control that allows for "multiple levels of access" to relevant information. Although not necessarily reflected in its proposed construction, Plaintiff appears to focus specifically on the issue of the ability of the security mechanism to make a determination about whether information can actually be transmitted between the claimed devices or not. It is worth noting that the parties initially supported these competing positions with competing general-purpose dictionaries and broad statements about the specification's goals in governing or "controlling" information transmission.

In presenting these arguments, the parties also initially gloss over what, exactly, the specification considers to be a "security mechanism" itself. The specification states that "the ability of various entities spread around a network to receive and/or transmit to and control the personal device 100 requires some measure of security." '233 Patent at 13:27-29. The specification goes on to list several "possible embodiments of security." *Id.* at 13:41-42. Specifically, the specification identifies "standard encryption algorithms," "voice and visual channels of transmission [that] may be controlled for activation," "security keys . . . held by a central agency," and a security key held by the user of the personal device. *Id.* at 13:43-54. The specification further describes strategies for authorization and authentication, such as biometrics, a public/private key system, a request for access by a user, and pre-authorized authority for certain users. *Id.* at 13:55-14:10.

It is not until Plaintiff's Responsive Brief that the issue critical to the parties' dispute (which is allegedly relevant to an issue of patent invalidity) takes center stage. Plaintiff initially argued that "[w]hile the specification may describe other forms of security that do not control the transmission of information (such as, for example, encryption), that is not what was intended by the language actually used in the claim." (Dkt. No. 77 at 13.) Through this assertion and as further elaborated in its Responsive Brief, Plaintiff appears to take the position that the claims require the security mechanism to be capable of fully preventing transmission of information for there to be "control."

Plaintiff supports its position by citing to its expert, Dr. Martin. Dr. Martin opines that "encryption is a technique that may protect information, but it does not govern or control its transmission." (Dkt. No. 77-6 at ¶ 33.) However, Dr. Martin does not provide any further explanation or cite to any evidence for this aspect of his opinion. (*Id.*) Moreover, the specification expressly discloses "standard encryption algorithms" as a "possible embodiment of security." '233 Patent at 13:41-44. Based on the disclosure in the specification, the Court finds Dr. Martin's conclusory opinion should not be afforded any weight. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1209 (Fed. Cir. 2013) (finding expert's opinion "deserves no weight" where opinions were "conclusory and incomplete; they lack any substantive explanation tied to the intrinsic record; and they appear to conflict with the plan language of the written description"); *see also Phillips*, 415 F.3d at 1318-19. Similarly, Plaintiff's citations to non-technical dictionaries published at least 14 years after the date the application was filed carry little weight.[2]

Plaintiff's position is otherwise not necessarily supported by the plain meanings of the terms "govern" and "control," in the context of the claimed technology. Plaintiff does not cite sufficient evidence to show that either word relates to an "all or nothing" approach to overseeing the transmission of data between the claimed first and second devices. Ultimately, Plaintiff has not presented a sufficient basis to conclude that "governing information transmitted between the first personal device and the second device" means "control whether information can be transmitted between the first personal device and the second device *at all*." The Court declines to limit the scope of the claims in such circumstances, particularly given the disclosed embodiments for types of security in the specification.

Defendants' arguments and late-proposed construction are not entirely satisfactory, either. Claim 1 is focused on a "first personal device" and a "second device." Unlike the embodiment shown in Figure 5 of the specification, there is no requirement on the face of the claims for a collection of multiple devices that can be swapped out to serve as the "second device." Introducing the concept of "multiple levels of access" is somewhat confusing given this context. Claim 1, on its face, already requires that the security mechanism govern information transmission. In addition to creating confusion, adding in the requirement that such "governance" requires a collection of "levels of access" also effectively narrows the scope of the claims in requiring different "levels," where no such requirement for levels is claimed or discussed in the specification.

Defendants' reliance on a general-purpose dictionary definition to import the concept of "continuous" is also questionable. As Plaintiff notes, Defendants' proposed definition relates to a king governing his subjects, not technology like that at issue here. Defendants do not refer to the specification to support this requirement. Construing as "continuous" could also create confusion about the meaning of this claim phrase. Although the Court generally agrees with both parties that, considered in the context of the patent specification, "governing information transmitted" must ultimately serve the purpose of preventing the wrong user from being able to review (unencrypted)

---

[2] The application for the '233 Patent was filed in 2002. '233 Patent at Cover. Plaintiff's cited dictionaries published in 2016 (Dkt. No. 77-11 at 2) and 2020 (Dkt. No. 77-8 at 4).

information, neither party has shown that their proposal is necessary to accomplish this goal.

At this time, the Court declines to construe the term "governing information transmitted between the first personal device and the second device."

4. "wireless communication" ('233 Patent, Claims 1, 13, 15, 16)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "an over-the-air communication (e.g. using radiofrequency (RF), infrared, or optical techniques)" | Plain and ordinary meaning |

The term "wireless communication" appears in Claims 1, 13, 15, and 16 of the '233 Patent. For example, Claim 1 recites in part: "the second device having a short-range bi-directional *wireless communications* module compatible with the short-range bi-directional *wireless communications* module of the first device . . . ." '233 Patent at Claim 1 (emphasis added).[3]

Plaintiff argues construction of the term should be limited to exclude communications "that utilize the human body as a conductor for an electrical signal." (Dkt. No. 77 at 13.) Defendants respond that the specification discloses devices that are surgically implanted and provide wireless communication. (Dkt. No. 79 at 12.)

The specification for the '233 Patent discloses personal medical devices that "may be surgically implanted." '233 Patent at 1:63-64; *see also id.* at 11:49-53 (disclosing as an example "a pacemaker that is imbedded in the chest cavity of the victim V"); *see also id.* at 14:17-19 ("For example, i[f] the personal device 100 is implanted in a human being, long battery life is essential."). Plaintiff argues the specification does not disclose "replacing wires" with "human flesh," then refer to this "hypothetical assembly as 'wireless.'" (Dkt. No. 77 at 13-14.) However, Plaintiff admits that the specification also refers to "over-the-air wireless communication techniques," including radio frequency ("RF") signals, and "describes implantable devices with which one would communicate with RF signals." (*Id.*) In light of Plaintiff's concession as well as the other disclosure in the patent specification regarding surgically implanted medical devices like pacemakers, and where the specification does not otherwise limit the scope of the term "wireless communications," the Court rejects Plaintiff's position and declines to construe the term "wireless communication" at this time.[4]

---

[3] Claim 1 is recited in full in Section III.B.3.

[4] Defendants failed to present argument regarding the meaning of this term in their Opening Brief and only addressed it in their Responsive Brief. Although the Court does not construe the term at this time, it notes that it is unclear to the Court what, exactly, Defendants intend to include within the full scope of their interpretation of the plain meaning of this term, including as it appears in the asserted claims. Plaintiff's objections to Defendants' position are similarly unclear. It may be appropriate to revisit the parties'

5.   "first personal device" ('233 Patent, Claims 1, 10, 14, 24)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively, "a device for private use by a person" | "first personal medical device" |

The term "first personal device" appears in Claims 1, 10, 14, and 24 of the '233 Patent. For example, Claim 1 recites in part:

> A bi-directional wireless communication system comprising:
>   (a) ***a first personal device***, the first personal device further comprising:
>       (i) a processor;
>       (ii) a memory;
>       (iii) a power supply;
>       (iv) at least one detector input; and
>       (v) a short-range bi-directional wireless communications module;
>   (b) . . .

'233 Patent at Claim 1 (emphasis added). Claim 1 is recited in full in Section III.B.3.

The parties dispute whether the phrase "first personal device" should be limited to a "medical" device. Defendants argue the disclosures in the specification, taken as a whole, warrant their proposed construction. (Dkt. No. 75 at 7; Dkt. No. 79 at 9-10.) Specifically, Defendants argue that the repeated use of "the legally significant term 'the present invention' to refer to embodiments that only contain Personal Medical Devices" supports their position. (Dkt. No. 75 at 7-8.) Defendants also argue "the only device disclosed in the '233 specification with the features of the claimed 'first personal device' is 'personal medical device (PMD) 100.'" (Dkt. No. 79 at 9.)

"When a patent [] describes the feature of the 'present invention' as a whole, this description limits the scope of the invention." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)). Here, the specification consistently describes the "personal device" of the "present invention" as a "personal medical device." For example, the specification states Figure 1 is a "block diagram

---

dispute when the Court has more context regarding its relevance to dispositive issues in this case, including issues relating to patent infringement and invalidity.

showing the overall structure of the system *of the present invention*" that illustrates "the interoperability of a personal medical device (PMD) 100 with a medical device interface . . . and a network 400." '233 Patent at 2:38-3:15 (emphasis added). Figure 1 depicts "Personal Medical Device," labeled as 100:



**FIG. 1**

'233 Patent at Fig. 1 (annotations added). The specification continually refers to "personal medical device (PMD) 100" in its description of various embodiments. *E.g.*, *id.* at 8:37-41 ("In another embodiment, the personal medical device 100 is directly connected to a personal wireless device 500 that is manufactured as an integrated unit."). Thus, the specification expressly refers to a "personal medical device" when describing the "invention as a whole."

Plaintiff argues that "[w]hile some embodiments . . . specifically describe a 'personal medical device 100' or 'PMD 100,' said device 100 is also repeatedly described as simply a 'personal device 100.'" (Dkt. No. 77 at 14.) That the specification later refers to the "personal medical device 100" as "personal device 100" does not warrant a different outcome. As noted above, Figure 1 illustrates the "system of the present invention" and expressly identifies "100" as a "personal medical device." '233 Patent at 2:38-39, 3:11-13. The specification does not subsequently redefine "100" as a general "personal device." As such, any subsequent reference to "personal device 100" is a reference to "Personal Medical Device (PMD) 100," as defined and illustrated in Figure 1. *Id.* at 2:38-3:15.

Plaintiff also argues the specification "broadly characterizes the 'present invention' as 'relating generally to bi-directional personal and health-wellness provider communication system[s]' . . . before discussing specific embodiments that utilize a 'medical' device." (Dkt. No. 80 at 11.) Plaintiff cites the first sentence of the "Background of the Invention" section to support its position. However, Plaintiff's cited sentence does not state "the present invention *is*." Instead, the sentence introduces the field the invention—one "*relat*[*ing*] *generally* to bi-directional personal and health-wellness provider communication system[s]." (*Id.* (emphasis added).) The specification goes on to identify the previously-discussed personal medical devices and to state the '233 Patent "describes a device and method to couple with *PMD*s to provide wireless communications . . . ." '233 Patent at 1:59-2:13 (emphasis added). Considering Plaintiff's cited sentence in the context of the specification as a whole, including the passages cited above, it does not support the conclusion that "personal device" has a broader meaning.[5]

The Court construes the term "first personal device" to mean "first personal medical device."

### 6. "body or physiological parameters" ('233 Patent, Claims 8, 9)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | Indefinite |
| Not indefinite | |

The term "body or physiological parameters" appears in Claims 8 and 9 of the '233 Patent. Claims 8 and 9 depend from Claims 1 and 7. Claim 1 is recited in full in Section III.B.3. Claims 7, 8, and 9 recite:

7. The system of claim 1, further comprising a detector connected to the at least one detector input.

8. The system of claim 7, wherein the detector senses *body or physiological parameters*.

9. The system of claim 8, wherein the *body or physiological parameters* are selected from the group consisting of temperature, motion, respiration, blood oxygen content, and electroencephalogram.

---

[5] Plaintiff also argues Defendants' proposed construction should be rejected and asserts that Defendants have a "desire to avoid infringement by arguing that [their] products are not 'personal medical devices' because they are not FDA approved." Dkt. No. 80 at 10. The Court makes no determination at this time as to the relationship between a "personal medical device" and the requirement to obtain FDA approval.

'233 Patent at Claims 7, 8, 9 (emphasis added). The specification states that "[d]etectors 140 may be any sensor of bodily or physiological parameters such as, but not limited to: temperature, motion, respiration, blood oxygen content, electrocardiogram (ECG), electroencephalogram (EEG), and other measurements." *Id.* at 3:29-33.

Defendants argue the term "body or physiological parameters" is indefinite because the specification does not explain the difference between a body parameter and a physiological parameter. (Dkt. No. 75 at 9.) Defendants further argue that during prosecution of the unrelated '377 Patent, the Examiner rejected then-pending claims of the '377 Patent because "[t]he examiner cannot discern based on the specification the distinction between physiological data and exercise data. . . . The broadest reasonable limitation of both terms cannot be discerned and as such the terms are indefinite." (Dkt. No. 76-1 at 3.) Defendants argue that likewise here, the terms body parameters and physiological parameters could overlap and are thus indefinite. (Dkt. No. 75 at 9-10.)

The specification provides examples of parameters, such as "temperature, motion, respiration, blood oxygen content, electrocardiogram (ECG), electroencephalogram (EEG), and other measurements." '233 Patent at 3:29-33. Claim 9 further recites "body or physiological parameters are selected from the group consisting of temperature, motion, respiration, blood oxygen content, and electroencephalogram." *Id.* at Claim 9. Defendants have not presented sufficient evidence to show by clear and convincing evidence that one of skill in the art would not understand the scope of "body or physiological parameters" based on these disclosures or the overall record.

Defendants' reference to the Examiner's rejection of claims during prosecution of the unrelated '377 Patent does not warrant a different outcome. As a preliminary matter, the Court is not persuaded by Defendants' argument that because body parameters and physiological parameters may have overlapping meanings, ("their Venn diagrams cross"), the terms are invalid. (Dkt. No. 79 at 13.) Defendants have not cited any legal authority to support such a proposition. Nor have they argued that one skill in the art would not understand the outer bound of the overlapping Venn diagrams. Furthermore, the prosecution history of the '377 Patent is of limited relevance, where the Examiner stated that Examiner could not discern the distinction between physiological data and exercise data *based on the specification*. (Dkt. No. 76-1 at 3.) The '377 Patent and '233 Patent do not share a specification.

Defendants have not satisfied their burden of showing the term "body or physiological parameters" is indefinite. Because neither part has proposed a construction, the Court declines to construe the term.

7. "location determination module" ('233 Patent, Claim 24)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | "a terrestrial location system" |

The term "location determination module" appears in Claim 24 of the '233 Patent. Claim 24 depends from Claim 1, which is recited in full in Section III.B.3. Claim 24 recites "[t]he system of claim 1, wherein the first personal device further comprises a *location determination module* that determines the geographical location of the first personal device." '233 Patent at Claim 24 (emphasis added). Dependent Claim 25 further recites "[t]he system of claim 24, wherein the *location determination module* further comprises a GPS receiver." *Id.* at Claim 25 (emphasis added).

The parties appear to agree that a GPS system is not a terrestrial system. (Dkt. No. 77 at 15; Dkt. No. 79 at 13.) The parties effectively disagree about whether the term "location determination module" must necessarily include a "terrestrial location system," or whether it could include just a satellite navigation system (such as a GPS receiver). The parties frame this dispute by focusing on the relationship between dependent Claims 24 and 25 and the law regarding dependent claims using the signal "further comprising." Plaintiff argues that "[w]hile the use of 'further comprising' may imply an additional limitation, it does not require the addition of a new, distinct element." (Dkt. No. 80 at 13.) Thus, Plaintiff argues Claim 24 "can more broadly be directed to a system directed to either terrestrial *or* satellite navigation, while claim 25 more narrowly, and specifically, requires a GPS receiver." (*Id.* (emphasis added).) Defendants argue that Claim 25's recitation of "further comprises a GPS receiver" is in addition to what is claimed in Claim 24. (Dkt. No. 79 at 13.) Thus, in Defendants' view, the "location determination module" of Claim 24 must itself already require something different from solely a GPS receiver.

The term "location determination module" appears to be used in the patent specification as a "coined term," rather than a technical term that would be commonly understood by a person of skill in the art. In particular, the specification describes an embodiment where "[Location Determination Module ('LDS')] 145 *uses a terrestrial location system*. There are several varieties of terrestrial solutions . . . ." '233 Patent at 13:17-19 (emphasis added). The specification further describes "[i]n one described embodiment, LDS 145 uses *a combination of* terrestrial and satellite navigation systems." *Id.* at 13:21-23 (emphasis added). This language in the specification supports the conclusion that the term must include a terrestrial location system at a minimum, and in some embodiments may further include a satellite navigation system.

The claim language, including the use of the phrase "further comprising" in Claim 25, supports this conclusion. Claim 25 recites a location determination module of Claim 24 "further compris[ing] a GPS receiver." The claim language thus supports that "GPS receiver" is an *additional* component relative to the "location determination module" recited by Claim 24. *See Celgene Corp. v. Hetero Labs Ltd.*, No. 17-3387, 2020 WL 3249117, at \*12 (D.N.J. June 16, 2020) (citing *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 996 (Fed. Cir. 2016)).

The intrinsic record accordingly supports Defendants' proposed construction. The Court construes "location determination module" as "a terrestrial location system."

8. "the bi-directional communications module has a powered-down state" ('233 Patent, Claim 26)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively, "bi-directional communications module has a powered state that is lower than the powered-up state" | "the bi-directional communications module of the first and second devices, each having a state that consumes no power" |

The term "the bi-directional communications module has a powered-down state" appears in Claim 26 of the '233 Patent. Claim 26 depends from Claim 1, which is recited in full in Section III.B.3. Claim 26 recites "[t]he system of claim 1, wherein the bi-directional communications module has a ***powered-down state*** and a powered-up state, and further comprising a means for signaling the bi-directional communications module to transition from the ***powered-down state*** to the powered-up state." '233 Patent at Claim 26 (emphasis added).

The specification describes that "[a]lthough some communications systems, such as BLUETOOTH, have ***low power consumption*** states, nevertheless power is being consumed." '233 Patent at 14:20-22 (emphasis added). The specification continues, "[i]t is therefore an important aspect of the present invention to provide a ***completely powered-off state*** for the bi-directional communications module . . . . The transceiver must consume ***no power*** in the ***powered-off state***." *Id.* at 14:27-33 (emphasis added).

Plaintiff argues the "powered-down state" simply refers to anything less than the "powered-up state," which would thus include a low-power state. (Dkt. No. 77 at 16.) Plaintiff argues for this construction "despite the fact that the specification describes a preferred embodiment focused on powered-off states," because it asserts the claims should not be confined to particular disclosed embodiments. (*Id.*) Defendants argue Plaintiff's citation to low-power states in the specification are in the context of describing prior art (*i.e.*, Bluetooth). (Dkt. No. 79 at 13-14.) Defendants further argue that the specification distinguishes the completely-powered off state of the claimed invention from the low-power state in Bluetooth. (*Id.* at 14.)

As noted, the specification expressly refers to a "completely powered-off-state," in which the transceiver "must consume no power," and describes this state as "an important aspect of the present invention." '233 Patent at 14:20-33. The Federal Circuit has held that description of a feature of the "present invention" as a whole limits the scope of the invention. *Regents of Univ. of Minn.*, 717 F.3d at 929 (citations omitted). Plaintiff's citations to the specification's description of a low-power state are in the context of prior art Bluetooth devices. '233 Patent at 14:20-22. Plaintiff's arguments are insufficient to overcome the specification's clear reference to the "present invention" as requiring a "completely powered-off state." *Id.* at 14:27-33.

The Court construes the smaller term "powered-down state" to mean "a state in which no power is consumed."

> 9. "means for signaling the bi-directional communications module to transition from the powered-down state to the powered-up state" ('233 Patent, Claim 26)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively, "a radiofrequency (RF) receiver, switch, pressure pad, or magnet (or equivalents thereof) that causes the bi-directional communications module to transition from the powered-down state to the powered-up state."<br><br>**Structure:**<br>a radiofrequency (RF) receiver, switch, pad, or magnet or equivalents thereof<br><br>**Function:**<br>signaling the bi-directional communications module to transition from the powered-down state to the powered-up state | **Structure:**<br>a mechanical signal, such as throwing a switch or applying pressure to a pad; a magnetic signal, as in passing a magnet in the vicinity of the communications module; sound or ultrasound; infrared, provided there is a direct line of sight to the communications module; or combination of RF transmitter and un-powered RF receiver that are tuned to the same frequency, and structural equivalents thereof<br><br>**Function:**<br>signaling the bi-directional communications module to transition from the powered-down state [i.e., state that consumes no power] to the powered-up state |

The parties agree that the term "means for signaling the bi-directional communications module to transition from the powered-down state to the powered-up state" is subject to 35 U.S.C. § 112 ¶ 6 as a means-plus-function term. The parties dispute (1) the proper interpretation of the claimed function and (2) the scope of the corresponding structure.

First, the parties dispute whether the disclosed "powered-down state" is only a state that consumes no power (Defendants' position), or can include a low-power consumption state (Plaintiff's position). In Section III.B.8, the Court construed a "powered-down state" to mean "a state in which no power is consumed." In light of this construction, the Court adopts the language in the claim as the claimed function.

Second, the parties offer alternative constructions for the corresponding structure. The parties, however, do little to explain how their proposed constructions differ. The parties appear to agree that the relevant portion of the specification is at column 14, lines 34-60, as well as Figure 7. (Dkt. No. 75 at 11.) Plaintiff argues its construction "is

consistent with the **entirety** of [the disclosure]." (Dkt. No. 80 at 14 (emphasis in original).) Plaintiff further argues Defendants' proposal is inconsistent with Defendants' position in their IPR petition. (Dkt. No. 77 at 17.) Defendants argue Plaintiff's proposed construction "cherry picks from the disclosure." (Dkt. No. 75 at 11.) Defendants further argue their IPR position is consistent with their proposed construction. (Dkt. No. 79 at 14.) Neither party provides any additional explanation.

The Court will adopt a construction consistent with the disclosure in the specification for "[a] number of mechanisms for doing this signaling." '233 Patent at 14:34-35. Specifically, the Court construes the term "means for signaling the bi-directional communications module to transition from the powered-down state to the powered-up state" as:

Subject to 35 U.S.C. § 112 ¶ 6

**Claimed Function**: "signaling the bi-directional communications module to transition from the powered-down state to the powered-up state"

**Corresponding Structure**: "a mechanical signal, a magnetic signal, sound or ultrasound, infrared provided there is a direct line of sight to the communications module, radio frequency, and structural equivalents thereof." *See* '233 Patent at 14:34-60, Fig. 7.

The Court notes this construction is most consistent with Defendants' description of the corresponding structure identified in their IPR petition. (Dkt. No. 77-14 at 21 ("The specification describes the corresponding structure for the claimed function as: components capable of providing a magnetic, mechanical, sound or ultrasound, infrared, or radio frequency signal, and structural equivalents thereof.").) The Court also finds that neither party provided a sufficient basis to depart from the clear disclosure in the specification.

10. "internet-enabled wireless web device" ('958 Patent, Claims 15-17)

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "internet-enabled wireless web device" ('958 Patent, Claims 15-17) | "a device designed to display interactive information through a connection to the internet" | **Original Construction:** "device without computing and processing capability that uses mobile telecommunication cellular network technologies to transfer data" <br><br> **Revised Construction:** Plain and ordinary meaning |

The term "internet-enabled web device" appears in Claims 15, 16 and 17 of the '958 Patent. These claims recite:

15. A computer program, residing on a computer-readable medium, containing instructions for causing an internet-enabled wireless web device in signal communication via a wireless network to the internet to:

> cause an ***internet-enabled wireless web device*** to receive data corresponding to a health parameter of a patient from a health monitoring device connected to or integral with the internet-enabled wireless web device, the health parameter indicative of a disease state or condition of a patient;

> wherein in the event of an interruption of the wireless connection between the internet-enabled wireless web device and the wireless network, the ***internet-enabled wireless web device*** is configured to store the health parameter from the health monitoring device in a memory or on a removable memory device.

16. A internet-enabled wireless web device for monitoring health, the internet-enabled wireless web device connected in wireless communication with a server running an application, comprising:

> ***an internet-enabled wireless web device*** with a removable memory device and running an application, the application functioning to accept inputs from a first communications port and a second communications port, the first communications port including a generic input/output port and the second communications port

including a wireless link to a network, the generic input/output port for receipt of a health parameter from a health monitoring device or visual data from a digital camera, the health parameter or visual data corresponding to a patient's disease state or condition;

wherein in the event of an interruption of the wireless connection between the internet-enabled wireless web device and the server, the ***internet-enabled wireless web device*** is configured to store the health parameter or visual data in a memory or on the removable memory device.

17.   The system of claim 16, wherein the ***internet-enabled wireless web device*** is selected from the group consisting of: an internet-enabled mobile phone; a handheld, palm, or laptop computer or personal digital assistant having an optional implemented or integral wireless capability; and a hybrid device of a handheld computer and mobile telephone.

'958 Patent at Claims 15, 16 and 17 (emphasis added).

The parties' dispute centers around whether an "internet-enabled wireless web device" ("WWD") is properly construed as a device "designed to display interactive information." (Dkt. No. 77 at 17.) Plaintiff argues the interactive connection of a WWD is a "defining characteristic" because the specification distinguishes prior art systems limited to "a mere one-way non-interactive data transfer." (*Id.*) Plaintiff further argues the WWDs identified in embodiments in the specification and recited in Claim 17 are "all examples of interactive internet-enabled devices." (*Id.* at 18.) Defendants argue Plaintiff's proposed construction of "designed to" is an improper subjective addition, and that "interactive" is likewise a new requirement.[6] (Dkt. No. 79 at 22-23.)

The specification states that "the present invention provides a method and system for assisting patients to manage a disease or maintain a healthy lifestyle by collecting health-related data and providing information in response to those data by means of a WWD designed to display interactive information through a connection to the Internet." '958 Patent at 3:27-32. The specification describes "a less interactive embodiment," where a device application measures a diabetic patient's blood glucose level and reports the same to the server application. *Id.* at 8:63-66. The specification further describes a

---

[6]  In their Opening Brief, Defendants proposed "internet-enabled wireless web device" ('958 Patent) should receive the same construction as "web-enabled wireless phone" ('377 Patent). (Dkt. No. 75 at 15-16.). In their Responsive Brief, however, Defendants shifted to plain and ordinary meaning for the term "internet-enabled wireless web device." (Dkt. No. 79 at 22-23.)

"highly interactive embodiment," where a wireless application "may correspondingly send a large amount of health data to server application." *Id.* at 9:1-4.

Claims 15 and 16 recite a WWD that "receive[s] data," "is configured to store the health parameter," and has "a removable memory device and run[s] an application." '958 Patent at Claims 15, 16. Plaintiff's proposed construction that the WWD: (1) be designed to display information, and (2) that the information be interactive, imposes limitations that do not appear in the claim language. Moreover, in light of the disclosures in the specification, Plaintiff's proposed construction is unsupported. Although the specification describes embodiments with "less interactive" and "highly interactive" applications, it is not clear what, if any, two-way data transfer is contemplated by the disclosed "less interactive" embodiment. Plaintiff also fails to provide an explanation of how a WWD is designed to display interactive information, and the specification does not necessarily provide such a description, either.

For these reasons, no construction is necessary for the term "internet-enabled wireless web device."

11. "health" terms

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "[a/the] health parameter / the health parameter indicative of a disease state or condition of a patient / the health parameter or visual data corresponding to a patient's disease state or condition" ('958 Patent, Claims 15, 16) | No construction necessary<br><br>Alternatively, "the health parameter indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician or a healthy individual interested in maintaining a healthy physiologic balance" | "information used by health care professional in diagnosing/treating a patient's [illness or sickness]" |
| "disease state or condition" ('958 Patent, Claims 15, 16) | No construction necessary | "disease state or disease condition"<br><br>a person of ordinary skill in the art would understand "disease" to mean illness or sickness |

| "health monitoring device" ('958 Patent, Claims 15, 16) | No construction necessary | "medical device, not exercise machine" |
|---|---|---|

Because of the related nature of the parties' disputes, the Court considers the disputed terms (1) "[a/the] health parameter / the health parameter indicative of a disease state or condition of a patient / the health parameter or visual data corresponding to a patient's disease state or condition," (2) "disease state or condition," and (3) "health monitoring device" together. The terms appear in Claims 15 and 16 of the '958 Patent, which are recited in full in Section III.B.10. Claim 15 recites in part a WWD "to receive data corresponding to a health parameter of a patient from a health monitoring device . . . , the health parameter indicative of a disease state or condition of a patient . . . ." '958 Patent at Claim 15. Claim 16 recites in part a WWD "running an application, the application functioning to accept inputs from a first communications port . . . , the first communications port including a generic input/output port . . . , the generic input/output port for receipt of a health parameter from a health monitoring device or visual data from a digital camera, the health parameter or visual data corresponding to a patient's disease state or condition . . . ." *Id.* at Claim 15.

The parties' dispute centers around whether the "health" parameter terms in the '958 Patent are limited to patients who are ill or sick, or whether they include patients who are healthy. Defendants assert the specification discloses two separate embodiments, one "for managing the disease state or condition of a patient," and the second "relating to nutrition or exercise." (Dkt. No. 75 at 20.) Defendants argue the claims of the '958 Patent are limited to the first embodiment, because the patent applicant disclaimed the second embodiment during prosecution of a later, related patent. (*Id.*)

"[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution. . . . This may occur, for example, when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). This type of "prosecution history disclaimer" can also be based on statements made during the prosecution of related patent applications:

> Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention.

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004).

Defendants' arguments specifically focus on the patent applicant's statements during prosecution of U.S. Patent No. 8,712,510 ("the '510 Patent"), which is a continuation-in-part of the '958 Patent. The '510 Patent is titled "Method and Apparatus *for Exercise Monitoring* Combining Exercise Monitoring and Visual Data with Wireless Internet Connectivity." During prosecution of the '510 Patent, the patent applicant made several statements to overcome double-patenting rejections over Claims 1-17 of the '958 Patent. Specifically, the patent applicant stated that "the claims in '958 . . . *only relate to disease states or conditions* of a patient. They do not relate to exercise parameters, much less to specific exercise monitors and machine such as treadmills." (Dkt. No. 76-11 at 17 (emphasis added).) In a later response, the patent applicant again stated that "[a]s noted previously, the claims noted in '958 *only relate to disease states or conditions* of a patient. While '958 includes reception and transmission of visual data, there is no teaching or disclosure of monitoring exercise . . . ." (Dkt. No. 76-12 at 21 (emphasis added).)

Patent applicant's clear and unmistakable disavowal of scope during prosecution of the '510 Patent limits the scope of Claims 1-17 of the '958 Patent. Specifically, the patent applicant stated on two occasions that the claims of the '958 Patent "*only* relate to disease states or conditions of a patient," as opposed to other considerations such as "exercise parameters." (Dkt. No. 76-11 at 17; Dkt. No. 76-12 at 21 (emphasis added).) Given this clear and unequivocal disclaimer during prosecution, any more general discussion in the patent specification of the '958 Patent fails to warrant a different outcome regarding the meaning of the term.

Through its position, Plaintiff effectively concedes that prosecution history disclaimer applies, but then apparently attempts to broaden the plain meaning of the phrase "disease states or conditions of a patient" to cover parameters generally related to a patient's health and wellness. This position is inconsistent with how the patent applicant distinguished "disease states or conditions" from "exercise parameters" during prosecution. Moreover, the Court agrees with Defendants that the intrinsic record separates general health and wellness parameters like "nutrition and exercise" from parameters relating to "disease states or conditions," *i.e.* "illness."

The Court construes the term "[a/the] health parameter" to mean "health parameter corresponding to a patient's disease state or condition." The Court finds it unnecessary to construe the terms "the health parameter indicative of a disease state or condition of a patient / the health parameter or visual data corresponding to a patient's disease state or condition," as those terms already explicitly refer to a patient's "disease state or condition." The Court simply rejects in this Order Plaintiff's suggestion that "disease state or condition" is a broad phrase encapsulating, for example, a "healthy individual interested in maintaining a healthy physiologic balance." Based on a similar

understanding, the Court finds no construction necessary for the term "disease state or condition." Finally, the Court determines that for the term "health monitoring device," the prosecution history disclaimer specifically supports that the claimed "monitoring device" is "only relate[d] to disease states or conditions of a patient [and] not relate[d] to exercise parameters, much less to specific exercise monitors and machine such as treadmills." (Dkt. No. 76-11 at 17.) Therefore, the Court construes the term "health monitoring device" to mean "a device for monitoring disease states or conditions of a patient."

12. "web-enabled wireless phone" ('377 Patent, Claims 1, 4)

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "web-enabled wireless phone" ('377 Patent, Claims 1, 4) | No construction necessary | "device without computing and processing capability that uses mobile telecommunication cellular network technologies to transfer data" |

The term "web-enabled wireless phone" appears in Claims 1 and 4 of the '377 Patent. These claims recite:

1. A method for interactive exercise monitoring, the method comprising the steps of:
   a. downloading an application to a ***web-enabled wireless phone*** directly from a remote server over the internet;
   b. coupling the a [sic] ***web-enabled wireless phone to a device*** which provides exercise-related information;
   c. rendering a user interface on the ***web-enabled wireless phone***;
   d. using the application, receiving data indicating a physiologic status of a subject;
   e. using the application, receiving data indicating an amount of exercise performed by the subject;
   f. wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising;
   g. sending the exercise-related information to an internet server via a wireless network;

> h. receiving a calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information; and
>
> i. using the application, displaying the response.

> 4. The method of claim 1, wherein the ***web-enabled wireless phone*** receives exercise-related information over a transmission medium, the transmission medium including a wired connection or a wireless connection.

'377 Patent at Claims 1, 4 (emphasis added).

The parties dispute whether a "web-enabled wireless phone" is limited to a device "without computing and processing capability." Defendants argue in favor of such a construction because "the applicant[] surrender[ed] claim scope" during prosecution. (Dkt. No. 75 at 15-16.)

During prosecution, the Examiner rejected, *inter alia*, Claims 1 and 4 as being obvious over two prior art references. (Dkt. No. 76-7 at 10.) Specifically, the Examiner stated that it would be obvious that a conventional computer could be replaced by a mobile phone. (*Id.* at 11.) In its response, the applicant distinguished the mobile phones at the time of the response (in 2011) from those at the time of the invention (in 1999). The applicant stated "the relatively small amount of memory and processing capability provided on a wireless phone in the 1990s, as compared to the present time, severely limited the functionality of applications running on the wireless phone." (*Id.*) The applicant stated that as a result, the claimed system provided "significant application functionality on the server, . . . thus freeing memory and processing" on the wireless phone. (*Id.*)

As noted above, an applicant must make "a clear and unmistakable disavowal of scope during prosecution" to warrant a finding of prosecution history disclaimer. *Purdue Pharma*, 438 F.3d at 1136. Here, the applicant argued that the "***relatively small*** amount of memory and processing capability" of a mobile phone in the 1990's did not render obvious a conventional computer replacing it. (Dkt. No. 76-7 at 11 (emphasis added).) The applicant's statements do not constitute the type of "clear and unmistakable" disclaimer that warrants Defendants' proposed construction that a "web-enabled wireless phone" has ***no*** amount of computing and processing capabilities.

This conclusion is further supported by the '377 Patent. Defendants' proposed construction describes a device "without computing and processing capability." However, the claims recite a device with at least some "computing and processing capability." *E.g.*, '377 Patent at Claim 1 (reciting a method for downloading an application to a web-enabled wireless phone, coupling the phone to a device, rendering a

user interface on the phone, and using the application); *see also id.* at Claim 4 (reciting method of Claim 1 wherein the phone receives exercise-related information). The specification likewise describes a device with at least some computing capabilities. *E.g., id.* at 4:32-35 ("[T]he relatively small amount of memory currently provided on a WWED . . . severely limits the functionality of applications running on the WWD . . . ."). Thus, the claims and the specification describe a web-enabled wireless phone that has at least some processing capabilities.

The Court declines to adopt Defendants' proposed construction and finds no construction necessary for the term "web-enabled wireless phone" on the current record.

13. "wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising" ('377 Patent, Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary<br><br>Not indefinite | Indefinite |

The term "wherein at least one of the data indicating a physiologic status of a subject . . ." appears in Claim 1 of the '377 Patent, which is recited in full in Section III.B.12.

The parties dispute whether the term "physiological status of a subject" is indefinite. Defendants argue that patent applicant's remarks during prosecution demonstrate its indefiniteness.

During prosecution, the Examiner rejected, *inter alia*, a version of Claim 1 of the '377 Patent as being indefinite. (Dkt. No. 76-1 at 3.) Specifically, the Examiner noted that Examiner "cannot discern based on the specification the distinction between physiological data and exercise data." (*Id.*) The Examiner further noted that "often times the two overlap," and provided the example of "heart rate." (*Id.*) In response, the patent applicant amended the claims to "recite receiving exercise-related information including physiological data and data indicating an amount of exercise performed." (Dkt. No. 76-2 at 9.) Patent applicant further stated that "[p]hysiological information is clear from the specification at, e.g., paragraph [0018] as describing devices that monitor the physiologic status of a healthy subject and data indicating an amount of exercise performed is described in the specification at, e.g., paragraph [0044]." (*Id.* (citations omitted).) Following an interview, patent applicant further amended the claims "to clarify the distinction between the two types of data." (Dkt. No. 77-12 at 7.) "The data indicating a physiologic status of a subject is exemplified in new dependent claims 20 and 21, and

data indicating an amount of exercise performed by the subject is exemplified in amended dependent claims 7 and 12." (*Id.* at 7-8.) The Examiner subsequently allowed the claims.

Defendants argue that "the distinction remains far from clear." (Dkt. No. 75 at 19.) However, the prosecution history demonstrates the Examiner rejected Claim 1 because of the overlap between "physiological data" and "exercise data." Patent applicant overcame the rejection by adding and amending dependent claims. *E.g.,* '377 Patent at Claim 12 (previously added as new Claim 20) ("data indicating a physiologic status of a subject is received from a device selected from the group consisting of: a heart rate monitor, a blood pressure monitor, a body temperature monitor, a respiratory monitor, a biofeedback device, an electronic body weight scale, and a body fat gauge"); *see also id.* at Claim 9 (previously amended Claim 7) ("data indicating an amount of exercise performed is received from a device selected from the group consisting of a treadmill, a stepper, an exercise cycle, an accelerometer, a rowing machine, physiotherapy equipment, an aerobic or anaerobic exercise device, and a device that monitors an amount of work or rate of work performed"). The Examiner determined the claims were sufficiently definite in light of these amendments. Defendants have presented no new argument sufficient to satisfy their burden of demonstrating by clear and convincing evidence that the term is indefinite.

Because neither party has proposed a construction for the term "wherein at least one of the data indicating a physiologic status of a subject . . . ," the Court declines to construe it.

14. "exercise-related information" terms

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a method for interactive exercise monitoring" ('377 Patent, Claim 1) | No construction necessary | "method for a user or third party to monitor during exercise" |
| "sending the exercise-related information to an internet server" ('377 Patent, Claim 1) | No construction necessary | "uploading the exercise-related information to an internet server in real-time, which does not include storing data about exercise and then uploading the same at a later time" |

| | | |
|---|---|---|
| "calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information" ('377 Patent, Claim 1) | No construction necessary | "calculation performed at the server based on the exercise related information sent to the server during the time of exercise" |

Because of the related nature of the parties' disputes, the Court considers the disputed terms (1) "a method for interactive exercise monitoring," (2) "sending the exercise-related information to an internet server," and (3) "calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information" together. The terms appear in Claim 1 of the '377 Patent. Again, Claim 1 of the '377 Patent recites:

> ***A method for interactive exercise monitoring***, the method comprising the steps of:
>> a. downloading an application to a web-enabled wireless phone directly from a remote server over the internet;
>> b. coupling the a [sic] web-enabled wireless phone to a device which provides exercise-related information;
>> c. rendering a user interface on the web-enabled wireless phone;
>> d. using the application, receiving data indicating a physiologic status of a subject;
>> e. using the application, receiving data indicating an amount of exercise performed by the subject;
>> f. wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising;
>> g. ***sending the exercise-related information to an internet server via*** a wireless network;
>> h. receiving a ***calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information***; and
>> i. using the application, displaying the response.

'377 Patent at Claim 1 (emphasis added).

The parties dispute whether the "exercise-related information" terms require monitoring and uploading of information to occur in "real-time." Defendants argue the

33

terms are limited to "real-time" because Defendants assert the patent applicant disclaimed monitoring and uploading of information that is not performed in real-time.

The claims on their face require real-time monitoring and uploading of information while a user is exercising. Claim limitation 1(f) recites "data indicating a physiologic status of a subject is received *at least partially* while the subject is exercising." '377 Patent at Claim 1 (emphasis added). The limitation requires real-time uploading, *i.e.*, uploading information while the subject is exercising. Similarly during prosecution, the patent applicant distinguished prior art "Root" by asserting Root utilized a standard telephone line and was thus not a wireless device. (Dkt. No. 76-5 at 9.) The patent applicant argued:

> The Root reference clearly is for storing data about exercise and then uploading the same at a later time via a standard telephone line, which is far different from real-time monitoring of exercise and physiological data and real-time uploading of the same via a web-enabled wireless phone, thus enabling the user to be free from being limited only to the location of a PC or telephone jack.

(*Id.* at 11-12.)

To the extent Defendants argue for proposed constructions that require *all* monitoring and uploading of information to occur in "real-time," Defendants have not sufficiently demonstrated patent applicant's statements, given their context of distinguishing Root on the basis that it disclosed use of a standard telephone line, provide a "clear and unequivocal disavowal" warranting such a narrow construction.

Having determined that Defendants' proposed construction is already incorporated to some extent in the claims, the Court declines to construe the terms "a method for interactive exercise monitoring," "sending the exercise-related information to an internet server," and "calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information."

15. "any one of a plurality of positions on a body of the subject" ('192 Patent, Claims 1, 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "any position on the body of a subject" |

The term "any one of a plurality of positions on a body of the subject" appears in Claims 1 and 20 of the '192 Patent. Claim 1 recites:

A measuring system comprising:

34

> a sensor arranged to be attached at ***any one of a plurality of positions on a body of a subject*** for obtaining a measured value representing a physical or a physiological quantity of the subject; and
>
> a processor coupled to said sensor, said processor being arranged to:
>> determine one of the plurality of positions on the subject to which the sensor is attached by analyzing the measured value for features that are position-dependent, and
>>
>> derive a subject-related value from the measured value, where the derivation of the subject-related value also depends on the one of the plurality of positions of the sensor on the subject.

'192 Patent at Claim 1 (emphasis added). Claim 20 recites:

> A method of deriving a value relating to a subject, the method comprising:
>> attaching a sensor to ***any one of a plurality of positions on the subject***;
>>
>> obtaining, in a processor, at least one measured value from the sensor attached to the subject, the measured value representing a physical or a physiological quantity of the subject;
>>
>> determining, using the processor, the one of the plurality of positions on the subject to which the sensor is attached by analyzing the measured value for features that are position-dependent; and
>>
>> deriving, using the processor, a subject-related value from the measured value in dependence on the one of the plurality of positions of the sensor on the subject.

*Id.* at Claim 20 (emphasis added).

The parties' dispute centers around whether the sensor can only be placed on one of a plurality of positions, or whether it can be placed anywhere on the body. Plaintiff argues that the specification contemplates "one of a plurality of more generalized positions," such as a wrist, waist, or lower leg. (Dkt. No. 77 at 22.) Defendants argue that "nothing in the specification limits the locations the monitor can be placed on the body." (Dkt. No. 75 at 11.)

The specification states that "a plurality of sensors are attached at different positions on the subject." '192 Patent at 3:3-4. The specification further states that "[a]ccording to an aspect of the invention, the plurality of positions includes at least two of the following: a wrist, a lower arm, an upper arm, a lower leg, an upper leg, a waist, a chest, a neck, a head." *Id.* at 3:9-13. Dependent Claim 2 similarly recites "[t]he measuring system as claimed in claim 1, wherein the sensor is arranged to be attached at

the plurality of positions that include: a wrist, a lower arm, an upper arm, a lower leg, an upper leg, a waist, a chest, a neck, and a head." The specification explains that "the positions mentioned are especially well suited for measuring the activity of the subject, and they are particularly convenient for wearing a sensor device." *Id.* at 3:13-17.

Although Plaintiff proposes no construction, its arguments indicate its view of the plain and ordinary meaning of the term is too narrow, because the specification does not limit the locations for sensors to a specific set of locations. The specification states that the sensors are attached "at different positions on the subject." *Id.* at 3:3-4. It does not limit where those positions can be. Moreover, even when the specification discloses an embodiment identifying a set of locations on the body, it states that the plurality of positions "***includes at least*** two of the following." *Id.* at 3:9. The embodiment thus contemplates placement of sensors outside the specified set of locations. To the extent Plaintiff argues the positions are "predetermined" (*see* Dkt. No. 75 at 12), nothing in the specification requires the positions be identified in advance or otherwise predetermined.

Defendants' proposed construction is too broad, because it excludes the list of locations disclosed by the specification, as well as dependent Claim 2. Defendants' disclaimer argument similarly overreaches. During prosecution, the patent applicant distinguished prior art "Merkel" by asserting Merkel disclosed a fitness device requiring placement in the "correct orientation on the body." (Dkt. No. 76-16 at 12.) For example, a device configured to be worn on the ankle could not be worn on the waist. (Dkt. No. 76-15 at 10.) The patent applicant argued that in contrast, the pending application for the '192 Patent permitted placement of a sensor at "any one of a plurality of positions" and could establish "at which of the plurality of subject positions the sensor [was] attached." (*Id.*) Based on the context of its statements, the patent applicant did not disclaim a sensor that could be placed on one of several possible locations.

In light of the analysis provided here, the Court declines to construe the term "any one of a plurality of positions on a body of the subject" at this time.

16. "analyzing the measured value for features that are position dependent" ('192 Patent, Claims 1, 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "analyzing the signal from the sensor that is correlated with activity to determine the position of the sensor on the body" |

The term "analyzing the measured value for features that are position dependent" is recited in Claims 1 and 20 of the '192 Patent, which are recited in full in Section

III.B.15. Claim 1 recites in part "a processor coupled to said sensor, said processor being arranged to[] determine one of the plurality of positions on the subject to which the sensor is attached by ***analyzing the measured value for features that are position-dependent*** . . . ." '192 Patent at Claim 1 (emphasis added).

Defendants argue their proposed construction "comes directly from the language employed in the specification." (Dkt. No. 75 at 12.) However, Plaintiff counters that Defendants' proposed construction would "limit the claim to an embodiment where 'signals' are analyzed (rather than, more broadly, 'measured values')." (Dkt. No. 77 at 23.) The Court agrees. Defendants have not provided any reason to limit the term "measured value" to "signal."

The claims on their face otherwise state that the point of "analyzing the measured value for features that are position-dependent" is to "determine one of the plurality of positions on the subject to which the sensor is attached." In other words, the claim language itself reflects at least in part Defendants' proposal "to determine the position of the sensor on the body." On the current record, and without understanding the relevance of the parties' dispute to dispositive issues in the case including infringement and invalidity (beyond providing space to rehash their dispute regarding the term "any one of a plurality of positions on a body of the subject" (*see* Section III.B.15)), the Court finds no construction is necessary for the term "analyzing the measured value for features that are position dependent" at this time.

17. "derive a subject-related value from the measured value, where the derivation of the subject-related value also depends on the one of the plurality of positions of the sensor on the subject" ('192 Patent, Claims 1, 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | "automatically adapt the measured value to compensate for measurement derivations that result from the location of the sensor" |

The term "derive a subject-related value . . ." is recited in Claims 1 and 20 of the '192 Patent, which are recited in full in Section III.B.15. Claim 1 recites in part:

a processor coupled to said sensor, said processor being arranged to:
determine one of the plurality of positions on the subject to which the sensor is attached by analyzing the measured value for features that are position-dependent, and

> *derive a subject-related value from the measured value, where the derivation of the subject-related value also depends on the one of the plurality of positions of the sensor on the subject.*

'192 Patent at Claim 1 (emphasis added).

The language of Claim 1 already requires that the subject-related value derived from the measured value "also depends on the one of the plurality of positions of the sensor on the subject."

Plaintiff argues that the claim phrase "is not limited to compensating for measurement deviations (but is more generally dependent on one of a plurality of positions)." (Dkt. No. 77 at 23-24.) Defendants argue that "[o]nce the system of the '192 Patent knows where the sensor is located on the body, it will automatically adapt the measured value to compensate for measurement deviations that result from the location of the sensor." (Dkt. No. 75 at 12.) To support their argument that the disputed claim phrase reflects this interpretation and requires compensation for "measurement deviations" specifically, Defendants refer to a preferred embodiment in the patent specification and an excerpt of the prosecution history. (*Id.* at 13.) Defendants' cited excerpts appear to simply track the plain claim language by noting that the system described in the '192 Patent will adjust a measured value by taking into account the location of a placed sensor. *See, e.g.*, '192 Patent at 3:51-64.

It is not entirely clear whether the parties indeed have a dispute regarding the meaning of this claim limitation. It seems possible that Plaintiff may simply object to Defendants' proposed use of the phrase "measurement deviations." Although not used in such a manner during prosecution, in common parlance, this phrase could be read as having a negative connotation, such as by referring to a measurement error. The Court also notes that the phrase does not appear at all designed to aid a juror's understanding of the meaning of this claim term. Defendants also provide no basis in either brief for their proposal that the processor "***automatically adapt*** the measured value to compensate" as opposed to the claimed requirement that it "***derive*** a subject-related value from the measured value," and the Court finds no basis to adopt such a requirement on the sparse record before it.

Plaintiff is also somewhat cursory and vague in its position and the implications of its position, which leads the Court to pause on its arguments as well. In Plaintiff's Responsive Brief, for example, Plaintiff merely notes that the claim should not be narrowed "to specific embodiments that concern specific methods for compensating for measurement deviations (as opposed to, more generally, the location on the body)." (Dkt. No. 80 at 24.) It is not clear exactly what Plaintiff means by this assertion. The Court

notes, however, that the claim language itself requires that the derivation "also depends on **_the one of_** the plurality of positions **_of the sensor_** **_on the subject_**." The phrase "the one of the plurality of positions of the sensor" takes antecedent basis from the portion of the claim requiring "determin[ing] one of the plurality of positions on the subject **_to which the sensor is attached_**." The derivation step thus relates specifically to accounting for the location of the sensor, not merely accounting for some location on the body where a sensor could or could not have been attached. To the extent Plaintiff would seek to broaden the meaning of the claim term to refer to other positions on the body where a sensor could be placed, but was not placed, Plaintiff's position is inconsistent with the plain claim language.

Without further understanding the parties' competing positions and how they are relevant to dispositive issues in this case, such as infringement or invalidity, the Court finds no construction is necessary for the term "derive a subject-related value from the measured value, where the derivation of the subject related value also depends on the one of the plurality of positions of the sensor on the subject" at this time.

18. '542 Patent terms

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "using one or more sensors physically coupled to the user and connected to a network, to monitor one or more vital parameters, providing data representative of the user's physical condition" ('542 Patent, Claim 13) | No construction necessary<br><br>Not indefinite | Indefinite |
| "analyzing the one or more vital parameters using a statistical analyzer" ('542 Patent, Claim 13) | No construction necessary<br><br>Not indefinite | Indefinite |
| "trained with training data representing physiological conditions determined to be undesirable for the user" ('542 Patent, Claim 13) | No construction necessary<br><br>Not indefinite | Indefinite |

| "warning indication when the user's physical condition is undesirable" ('542 Patent, Claim 13) | No construction necessary<br><br>Not indefinite | Indefinite |
|---|---|---|

Because of the related nature of the parties' disputes, the Court considers the disputed terms for the '542 Patent together. The terms appear in Claim 13 of the '542 Patent, which recites:

> 13. A method for maintaining wellness in a user comprising the following steps:
>    a. **using one or more sensors physically coupled to the user and connected to a network, to monitor one or more vital parameters, providing data representative of the user's physical condition**;
>    b. **analyzing the one or more vital parameters using a statistical analyzer**, **trained with training data representing physiological conditions determined to be undesirable for the user** to analyze the vital parameters to determine if the physiological conditions are undesirable; and
>    c. generating a **warning indication when the user's physical condition is undesirable**.

'542 Patent at Claim 13 (emphasis added).

Defendants argue two aspects of the terms are indefinite: "undesirable for the user" and "vital parameters." (Dkt. No. 75 at 23-24.) Defendants argue "undesirable" is indefinite because it is facially subjective, and "vital parameters" is indefinite because the '542 Patent "never defines the boundaries of what 'vital parameters' should be monitored or assessed to determine whether physical conditions are 'undesirable.'" (*Id.* at 24-25.) Plaintiff argues one of ordinary skill would understand the terms in light of the specification and exemplary embodiments. (Dkt. No. 77 at 24.)

Defendants have not shown by clear and convincing evidence that either "undesirable for the user" or "vital parameters" is indefinite. In presenting their arguments for indefiniteness of both phrases, Defendants argue that "neither the specification nor the claim language ever define or provide proper contextual support . . . ." (Dkt. No. 75 at 23.) The '542 Patent is titled "Health Monitoring Appliance," and states it is a "heart monitoring system for a person . . . ." '542 Patent at Title, Abstract. Claim 13 further recites "[a] method for maintaining wellness in a user . . . ." *Id.* at Claim 13. The specification further describes examples relating to health. *E.g.*, *id.* at 1:61-63 ("a heart disease recognizer coupled to the sound transducer to determine cardiovascular health"); *id.* at 2:4-5 ("an accelerometer to detect a dangerous condition"); *id.* at 2:12-13 ("an accelerometer to detect a dangerous condition such as a falling condition"); *id.* at 2:30 ("processing the [infant] vital parameter to detect SIDS onset"). In light of these disclosures, Defendants have not shown by clear and convincing evidence that one of skill would understand the patent's disclosures to be related to any field other than health monitoring.

Regarding the term "undesirable for the user," the specification describes data "determined to be undesirable for the patient, given his age, weight, and physical limitations, among others." *Id.* at 9:26-29. The specification further provides examples of monitoring data to detect undesirable conditions. For example, the specification describes a patient whose "glucose level should be within a well-established range." *Id.* at 9:29-30. The specification also describes a patient monitored with "an accelerometer to detect a dangerous condition such as a falling condition." *Id.* at 2:12-14. The specification also describes placing a sensor in an infant's diaper to collect infant vital parameters "to detect SIDS onset." *Id.* at 2:29-30. The specification also describes use of a sound transducer "to transmit heart sound over the wireless network to a remote listener if the recognizer identifies a cardiovascular problem." *Id.* at 63-65. In light of these disclosures, Defendants have not shown by clear and convincing evidence that one of skill in the art in health monitoring could not determine what would be undesirable for a patient, given the patient's individual characteristics. Of note, Defendants have not cited any evidence to show that persons of skill in the art would disagree as to what is "desirable" for a particular patient, when that term is considered in the context of health monitoring and a person of skill's respective knowledge of correlations between a particular type of data and a particular medical condition. Defendants' cited authority focuses on the subjective aspect of what is "aesthetically pleasing." (Dkt. No. 79 at 24.) However, unlike the subjective aspect of Defendants' cited authority, the specification here indicates a "desirable" treatment for a patient is one akin to treatment objectively in the best interests for the health of the patient. Moreover, Defendants' example that two patients could have identical blood pressure readings, but that those readings could be identified as desirable and undesirable: (1) is inapposite to the claim language specifying a parameter is "undesirable ***for the user***" (*i.e.*, a singular user) and (2) is unsupported by any evidence or expert testimony.

Furthermore, Claim 13 is not wholly directed towards determining whether a condition is undesirable. It recites a "method for maintaining wellness" in which a statistical analyzer is "trained with training data representing physiological conditions determined to be undesirable for the user . . . ." '542 Patent at Claim 13. In *ABS Global, Inc. v. Inguran, LLC*, the court determined claims reciting a "desired" and "acceptable" purity were not indefinite, because the claims recited "a procedure for achieving a certain purity or quantity." No. 14-cv-503, 2016 WL 3963246, at *26 (W.D. Wis. July 21, 2016). Similarly here, Claim 13 recites a statistical analyzer trained with data to communicate when a user's vital parameters correspond to the training data representing physiological conditions.

Regarding "vital parameters," the Court determines the term is not indefinite for the same reasons. Defendants have not proven by clear and convincing evidence that one of skill in the art would not understand which parameters were vital to determine an undesirable physical condition for an individual patient. Furthermore, the specification provides examples of such parameters. *E.g.*, '542 Patent at 1:56-57 ("heart rate, heart rate variability, respiratory rate, fluid status, posture and activity"); *id.* at 2:34-47 (listing parameters including respiratory rate, oxygen saturation, electrocardiogram, heart rate, core temperature, etc.).

Because the Court determines Defendants have not shown by clear and convincing evidence that "undesirable for the user" and "vital parameters" are indefinite, and because neither party has proposed a construction, the Court declines to construe the terms that include the phrases "undesirable for the user" or "vital parameters" at this time.

## IV.    CONCLUSION

| Term | Court's Construction |
|---|---|
| "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" ('007 Patent, Claims 1, 21) | Indefinite under 35 U.S.C. § 112. |
| "means for presenting the athletic performance feedback data to an athlete" ('007 Patent, Claims 1, 21) | Moot based on the Court's determination for "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" |
| "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" ('007 Patent, Claim 7) | Moot based on the Court's determination for "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" |
| "means for exchanging GPS route waypoints via said Internet web site" ('007 Patent, Claim 25) | Moot based on the Court's determination for "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" |
| "governing information transmitted between the first personal device and the second device" ('233 Patent, Claim 1) | No construction |
| "wireless communication" ('233 Patent, Claims 1, 13, 15, 16) | No construction |
| "first personal device" ('233 Patent, Claims 1, 10, 14, 24) | "first personal medical device" |

| | |
|---|---|
| "body or physiological parameters" ('233 Patent, Claims 8, 9) | Not indefinite; no construction |
| "location determination module" ('233 Patent, Claim 24) | "a terrestrial location system" |
| "the bi-directional communications module has a powered-down state" ('233 Patent, Claim 26) | Smaller term "powered-down state" construed as "a state in which no power is consumed" |
| "means for signaling the bi-directional communications module to transition from the powered-down state to the powered-up date" ('233 Patent, Claim 26) | Subject to 35 U.S.C. § 112 ¶ 6<br><br>**Claimed Function**: "signaling the bi-directional communications module to transition from the powered-down state to the powered-up state"<br><br>**Corresponding Structure**: "a mechanical signal, a magnetic signal, sound or ultrasound, infrared provided there is a direct line of sight to the communications module, radio frequency, and structural equivalents thereof." *See* '233 Patent at 14:34-60, Fig. 7. |
| "internet-enabled wireless web device" ('958 Patent, Claims 15-17) | No construction |
| "[a/the] health parameter / the health parameter indicative of a disease state or condition of a patient / the health parameter or visual data corresponding to a patient's disease state or condition" ('958 Patent, Claims 15, 16) | term "[a/the] health parameter" construed as "health parameter corresponding to a patient's disease state or condition" |
| "disease state or condition" ('958 Patent, Claims 15, 16) | No construction |

| | |
|---|---|
| "health monitoring device" ('958 Patent, Claims 15, 16) | "a device for monitoring disease states or conditions of a patient" |
| "a method for interactive exercise monitoring" ('377 Patent, Claim 1) | No construction |
| "web-enabled wireless phone" ('377 Patent, Claims 1, 4) | No construction |
| "wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising" ('377 Patent, Claim 1) | Not indefinite; no construction |
| "sending the exercise-related information to an internet server" ('377 Patent, Claim 1) | No construction |
| "calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information" ('377 Patent, Claim 1) | No construction |
| "any one of a plurality of positions on a body of a subject" ('192 Patent, Claims 1, 20) | No construction |
| "analyzing the measured value for features that are position dependent" ('192 Patent, Claims 1, 20) | No construction |

| | |
|---|---|
| "derive a subject-related value from the measured value, where the derivation of the subject-related value also depends on the one of the plurality of positions of the sensor on the subject (192 Patent, Claims 1, 20) | No construction |
| "using one or more sensors physically coupled to the user and connected to a network, to monitor one or more vital parameters, providing data representative of the user's physical condition" ('542 Patent, Claim 13) | Not indefinite; no construction |
| "Analyzing the one or more vital parameters using a statistical analyzer" ('542 Patent, Claim 13) | Not indefinite; no construction |
| "trained with training data representing physiological conditions determined to be undesirable for the user" ('542 Patent, Claim 13) | Not indefinite; no construction |
| "warning indication when the user's physical condition is undesirable" ('542 Patent, Claim 13) | Not indefinite; no construction |

**IT IS SO ORDERED.**